# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| WILLIAM KEITH SPEER, | § | |
| | § | |
| | § | CASE NO. _____ |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | **THIS IS A CAPITAL CASE** |
| BOBBY LUMPKIN, Director of Correctional | § | |
| Institutions, Texas Dept. of Criminal Justice; | § | |
| | § | |
| KELLY STRONG, | § | |
| Warden, Texas State Penitentiary Huntsville | § | **EXECUTION SET FOR** |
| Unit; | § | |
| | § | **OCTOBER 26, 2023** |
| BRYAN COLLIER, | § | |
| Executive Director, Texas Dept. of Criminal | § | |
| Justice; | § | |
| | § | |
| *Defendants.* | | |

## COMPLAINT PURSUANT TO 42 U.S.C. § 1983

Maureen Scott Franco
Federal Public Defender
Western District of Texas

Joshua Freiman
Fed Bar No. 3342395
NY Bar No. 5353545
Donna Coltharp
Assistant Federal Public Defenders
919 Congress Ave., Ste. 950
Austin, Texas 78701

*Counsel for William Keith Speer*

## TABLE OF CONTENTS

TABLE OF EXHIBITS ................................................................................................ 3

INTRODUCTION ...................................................................................................... 5

JURISDICTION ......................................................................................................... 6

VENUE ..................................................................................................................... 7

PARTIES ................................................................................................................... 7

FACTUAL AND LEGAL BACKGROUND ................................................................ 7

    A.   MR. SPEER HAS A LIBERTY INTEREST CREATED BY TEXAS LAW IN
        FREEDOM FROM "TORTURE, OR ILL TREATMENT, OR UNNECESSARY
        PAIN" AND FROM "CRUEL OR UNUSUAL PUNISHMENT." ........................... 8

    B.   UPON INFORMATION AND BELIEF, TDCJ INTENDS TO DEPRIVE MR.
        SPEER OF HIS LIBERTY INTEREST BY EXECUTING HIM USING
        COMPROMISED CHEMICALS. ........................................................................ 9

        1.   TDCJ'S SUPPLY OF EXECUTION DRUGS WAS COMPROMISED BY
            A CATASTROPHIC FIRE. .......................................................................... 9

        2.   EVEN BEFORE THE FIRE, ALL OF TDCJ'S EXECUTION DRUGS
            HAD EXPIRED. ....................................................................................... 13

        3.   TDCJ HAS NOT PERFORMED NECESSARY TESTING TO PROVE
            ITS EXECUTION DRUGS ARE NOT COMPROMISED ......................... 16

            A)   TDCJ LABORATORY REPORTS OF POTENCY TESTING ON
                PENTOBARBITAL VIALS FOLLOWING THE FIRE DO NOT
                DEMONSTRATE THE DRUGS ARE UNTAINTED. ....................... 16

            B)   TDCJ POTENCY TESTING OF EXPIRED PENTOBARBITAL DOES
                NOT EXTEND THE BEYOND USE DATE OF THE DRUGS ........ 17

        4.   THE USE OF COMPROMISED EXECUTION DRUGS WILL CAUSE
            SEVERE HARM TO MR. SPEER. .............................................................. 20

    C.   RECENT LITIGATION IN TEXAS COURT CONFIRMED FACTUAL
        ALLEGATIONS THAT TDCJ'S DRUG SUPPLY WAS TAINTED, BUT
        PROVIDED NO RELIEF TO AFFECTED INMATES. ......................................... 20

    D.   MR. SPEER HAS BEEN DENIED ADEQUATE PROCESS TO CHALLENGE
        THE DEPRIVATION OF HIS LIBERTY INTEREST. .......................................... 23

1.   TDCJ IS OBSTRUCTING MR. SPEER'S DISCOVERY OF THE FIRE'S
IMPACT ON THE DRUGS DEFENDANTS WILL USE TO EXECUTE
HIM THROUGH PUBLIC INFORMATION ACT REQUESTS. ............... 24

2.   TDCJ HAS ALSO REFUSED TO PROVIDE INFORMATION ABOUT
THE FIRE'S IMPACT ON EXECUTION DRUGS IN RESPONSE TO
MR. SPEER'S ADMINISTRATIVE GRIEVANCES ................................. 26

3.   MR. SPEER CANNOT OBTAIN RELIEF FROM THE TEXAS
COURTS. ................................................................................................. 26

CLAIM FOR RELIEF ............................................................................................. 28

I.   TEXAS HAS DEPRIVED MR. SPEER OF HIS LIBERTY INTEREST WITHOUT
ADEQUATE PROCESS, IN VIOLATION OF THE PROCEDURAL DUE PROCESS
CLAUSE OF THE FOURTEENTH AMENDMENT. ......................................................... 28

**TABLE OF EXHIBITS**

| EXHIBITS | DESCRIPTION |
|---|---|
| 1 | Execution Order |
| 2 | Death Warrant |
| 3 | Judgment of Conviction and Sentence |
| 4 | TDCJ Execution Protocol, Apr. 21, 2021 |
| 5 | Brenda Poe, *Walls Unit Damage in Overnight Fire*, The Huntsville Item (Aug. 25, 2023) |
| 6 | Huntsville Fire Dept. Report on Aug. 25, 2023 Fire |
| 7 | Milke et al., Overview of Fire Protection in Buildings, Federal Emergency Management Agency |
| 8 | Poe, *Inmates Evacuated Because of Fire at Texas Prison Unit*, The Clinton Herald (Aug. 25, 2023). |
| 9 | Ken Miller, All Prisoners Accounted For After Fire at Texas Prison Forces Evacuation, NBCDFW (Aug. 25, 2023) |
| 10 | Expert Declaration of Michaela Almgren, Pharm.D., M.S., Dec. 12, 2022 |
| 11 | NIH National Library of Medicine, PubChem: Pentobarbital (Compound) |
| 12 | Addendum to Report of Dr. Almgren |
| 13 | Myriam Ajemni et al., Stability-Indicating Assay for the Determination of Pento-barbital Sodium in Liquid Formulations, International Journal of Analytical Chemistry, 2015 |
| 14 | Lab Reports |
| 15 | Huntsville Unit Storage Inventory Logs 2.5 g |
| 16 | DEA Forms |
| 17 | Huntsville Unit Storage Inventory Logs 5 g |

| EXHIBITS | DESCRIPTION |
|----------|-------------|
| 18 | Post-Fire Lab Reports of Two Vials of Pentobarbital |
| 19 | N. Chiannilkulchai, et al., Safety Concerns with Glass Particle Contamination: Improving the Standard Guidelines for Preparing Medication Injections, Int. J. Qual. Health Care, 33(2) (Jun. 2021) |
| 20 | J.W. Puntis et al., Hazards of Parenteral Treatment: Do Particles Count? Arch. Dis. Child, 67(12), 1475-77 (Dec. 1992) |
| 21 | Original Petition, *Ruiz et al. v. TDCJ et al.*, Case No. D-1-GN-22-007149 (345th District Court, Travis County) |
| 22 | *In re State ex rel. Ken Paxton,* No. WR-94, 432-01, 2023 WL 110625 (Tex. Crim. App. Jan. 4, 2023). |
| 23 | Temporary Injunction of Travis County Civil District Court, *Ruiz et al. v. TDCJ et al.*, (Jan. 10, 2023) |
| 24 | Jan. 10, 2023, Evidentiary Hearing Transcript |
| 25 | *In re State ex rel. Paxton*, No. WR-94,432-01, 2023 WL 151779 (Tex. Crim. App. Jan. 10, 2023) |
| 26 | *In re State ex rel. Paxton*, 667 S.W.3d 752, 753 (Tex. Crim. App. Jan. 4, 2023) (Newell, J., dissenting) |
| 27 | PIA Request, Sept. 18, 2023 |
| 28 | PIA Email Response from TDCJ Office of General Counsel, Sept. 26, 2023 |
| 29 | Notification of Request for Decision, Sept. 26, 2023 |
| 30 | Letter Brief Regarding Speer PIA Request, Sept. 27, 2023 |
| 31 | PIA Correspondence Between Jedidiah Murphy and TDCJ |
| 32 | Oct. 4, 2023 Application for Writ of Habeas Corpus. |
| 33 | Trial Court Denial of Original Writ of Habeas Corpus |

## INTRODUCTION

1. This is not a typical "method of execution" lawsuit.  It arises from an unanticipated catastrophic event that materially changes the legality of Plaintiff William Keith Speer's October 26, 2023 execution.

2. On August 25, 2023, an uncontrolled building fire catastrophically damaged the third floor of the Administration Building at the Huntsville Unit of the Texas Department of Criminal Justice (TDCJ). The Huntsville Unit is not only the location where TDCJ (through Defendants) is scheduled to execute Mr. Speer on October 26, 2023; it is also the location where Defendants stored the single drug they use to carry out such executions: pentobarbital.

3. TDCJ's supply of pentobarbital was exposed, during an extended period, to excessively high temperatures (upwards of 1800˚ Fahrenheit), smoke, and water during the fire and suppression efforts, which lasted up to ten hours.

4. When exposed to high temperatures, pentobarbital quickly degrades, insoluble precipitates form, and the drug's pH is impacted. As pentobarbital degrades, its chemical structure changes, and it turns into an entirely different chemical substance with a different pharmacological impact on the body.

5. Even before the fire, there were multiple reasons to doubt the safety and integrity of the chemicals that TDCJ will use to execute Mr. Speer: The pentobarbital was stored under improper conditions; TDCJ acquired it via unlawful methods; TDCJ fails to comply with numerous state laws concerning possession of controlled substances; TDCJ conceals the identity of the pharmacy and laboratory it uses to compound and test pentobarbital; and—most disturbingly—the pentobarbital was already expired.

6. TDCJ intends to execute Mr. Speer with unlawfully obtained, long-expired, and recently fire-damaged drugs. Based on the information available to Mr. Speer, there is a substantial

likelihood that the fire-blighted, long-expired pentobarbital—or whatever chemical substance it has now become—that TDCJ will use to execute Mr. Speer will act unpredictably, obstruct IV lines during the execution, and cause Mr. Speer significant and unnecessary pain and suffering.

7.      TDCJ has obstructed Mr. Speer's attempts to learn the state of its pentobarbital following the Huntsville Unit Fire, failing to respond to his requests under the Public Information Act and his internal inmate grievance.

8.      The Texas state courts have provided Mr. Speer no way to redress this immediate threat to his rights, including his right under Article I, § 13 of the Texas Constitution of 1876 as well as multiple state and federal statutes.  As such, Mr. Speer is being denied the due process of law, in violation of the Fourteenth Amendment to the United States Constitution.

9.      In this action, Mr. Speer seeks relief from this violation of his constitutional right to due process,[1] beginning with a preliminary injunction and/or stay of Mr. Speer's impending execution in order to permit litigation of this action in this Court.

## JURISDICTION

10.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) & (4), 2201(a), 42 U.S.C,§ 1983, and original federal question jurisdiction stemming directly from the United States Constitution.[2]

---

[1] In this action, Mr. Speer is not challenging his conviction, his sentence, or the lethal-injection procedures under the Texas Code of Criminal Procedure. Mr. Speer challenges the obstruction of his access to information in the State of Texas's possession that directly concerns whether he will be subject to undue suffering, in violation of multiple provisions of law that confer on him a liberty interest of freedom from having such suffering inflicted by the State. He also challenges the unavailability anywhere in either the civil or criminal state courts of Texas of a forum that can and will address the important questions raised by Mr. Speer regarding the deprivation of his liberty interests, including his interest under Article 43.24, which guarantees condemned prisoners freedom from the infliction of torture, unnecessary pain, and ill treatment.

[2] Given the above jurisdictional grants, this Court has additional authority under 28 U.S.C. § 1651(a), the "All Writs Act," by which Congress vested this Court with the authority to "issue all writs necessary or appropriate in aid of [its] jurisdiction[.]"

## VENUE

11.     Venue lies in this Court under 28 U.S.C. § 1391 because the events giving rise to this action occurred in the Southern District of Texas (Houston Division), and Defendant Strong maintains an official office address in the Southern District of Texas (Houston Division).

## PARTIES

12.     Plaintiff William Keith Speer is a United States Citizen who resides in the State of Texas, currently incarcerated in the Allan B. Polunsky Unit of the Texas Department of Criminal Justice in Livingston, Texas, and under a sentence of death imposed by the 5th District Court in Bowie County, Texas.  He is scheduled to be executed on October 26, 2023.

13.     Defendant Bobby Lumpkin, sued here in his official capacity, is the Director of Correctional Institutions of TDCJ, the agency that will carry out Mr. Speer's execution.

14.     Defendant Bryan Collier, sued here in his official capacity, is the Executive Director of TDCJ, the agency that will carry out Mr. Speer's execution.

15.     Defendant Kelly Strong is the Warden of the Huntsville Unit of TDCJ, the facility where the TDCJ will carry out Mr. Speer's execution.

## FACTUAL AND LEGAL BACKGROUND

16.     Mr. Speer is scheduled to be executed on October 26, 2023.

17.     TDCJ's execution protocol, adopted on April 21, 2021, requires lethal injection with 5 grams of the drug pentobarbital.[3]

18.     TDCJ's pentobarbital was affected by a catastrophic fire at the Huntsville Unit on August 25, 2023.

---

[3] Ex. 4, TDCJ Execution Protocol, at 10.

A.   **Mr. Speer Has a Liberty Interest Created by Texas Law in Freedom From "Torture, or Ill Treatment, or Unnecessary Pain" and from "Cruel or Unusual Punishment."**

19.    Federal courts, including the United States Supreme Court, have frequently assessed protected liberty interests created by state laws under the procedural Due Process Clause of the Fourteenth Amendment.[4]

20.    It is also standard practice to find a protected "property" interest as defined by state law for the purposes of procedural Due Process Clause violations.[5]

21.    The State of Texas guarantees condemned inmates freedom from "torture, or ill treatment, or unnecessary pain."[6]   The same is true for the state constitutional right against "cruel or unusual punishment."[7][8]

---

[4] *See*, *e.g.*, *Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 68 (2009) (finding Respondent has "a liberty interest in demonstrating his innocence with new evidence under [Alaska Stat. § 12.72.010(4) (2008)]"); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) ("[T]he State having created the right to good time [credits]…the prisoner's interest…is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated."); *Emerson v. Thaler*, 544 F. App'x 325, 327 (5th Cir. 2013) ("Although states are under no obligation to provide mechanisms for postconviction relief, when they choose to do so, the procedures they create must comport with due process and provide litigants with a fair opportunity to assert their state-created rights.").
[5] *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.").
[6] Tex. Code Crim. Proc. art 43.24 ("No torture, or ill treatment, or unnecessary pain, shall be inflicted upon a prisoner to be executed under the sentence of the law").
[7] Tex. Const. art. 1 § 13.
[8] This guarantee under the Texas Constitution is different from the Eighth Amendment guarantee under the United States Constitution, which applies only to punishment that is both cruel *and* unusual.  The Texas guarantee is framed using the disjunctive, which makes the Texas guarantee broader.  Mr. Speer in this case is invoking the right guaranteed by the Texas Constitution.

22.     This freedom from "torture, or ill treatment, or unnecessary pain" is a liberty interest guaranteed by state law. Use of the word "shall" in the code creates a legitimate expectation of freedom from "torture, or ill treatment, or unnecessary pain."[9]

**B.     Upon Information and Belief, TDCJ Intends to Deprive Mr. Speer of His Liberty Interest by Executing Him Using Compromised Chemicals.**

**1.     TDCJ's Supply of Execution Drugs Was Compromised by a Catastrophic Fire.**

23.     At approximately 2:30 a.m. on August 25, 2023, a fire erupted in the Administration Building at TDCJ's Huntsville Unit. It burned for up to ten hours, causing catastrophic damage to the third floor of the Administration Building, among other areas of the building.

24.     Multiple agencies, including the Huntsville Fire Department, the Montgomery County Emergency Services, the Willis Fire Department, the Walker County Emergency Services, the New Waverly Fire Department, the Crabb Prairie Fire Department, the Dodge Fire Department, the Riverside Fire Department, the Walker County Office of Emergency Management, and the Texas Department of Emergency Management responded to the scene.

25.     Greg Mathis, Fire Chief of the Huntsville Fire Department, led the fire response. According to Chief Mathis, emergency personnel finally managed to get the main blaze under control at approximately 6:30 a.m., four hours after the initial alarms rang out. However, personnel remained on the scene and continued to battle small fires and smoke in the Administration Building until approximately noon.

---

[9] Tex. Code Crim. Proc. art 43.24; *see also Sandin v. Connor*, 515 U.S. 472, 479 (1995) ("The Court [in *Greenholtz*] accepted the inmates argument that the word 'shall' in the statute created a legitimate expectation of release [from parole] absent the requisite finding that one of the justifications for deferral existed"); *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12 (1979) ("We can accept respondents' view that the expectancy of release provided in this statute is entitled to some measure of constitutional protection.").

26.     News reports indicate that the Administration Building was subject to extensive damage. At a press conference held after the fire, Chief Mathis indicated that dealing with the damage will require "a pretty extensive mop-up operation."[10]

27.     Given the extent of the damage, TDCJ was forced to relocate the staff that worked in the Administration Building as well as 655 inmates who were housed in a housing block next to the Administration Building.

28.     The affected areas of the Administration Building remain "sealed off until the State and local investigations can be completed."[11] The investigation remains ongoing.

29.     According to a report written by Captain Jon Brandon Kolaja from the Huntsville Fire Department, an unnamed correctional officer approached Captain Kolaja as the fire was blazing and asked him to "check on the pharmacy" – which, on information and belief, refers to lethal injection chemicals stored in the Administration Building.[12]

30.     According to the report, Captain Kolaja and the unnamed officer donned self-contained breathing apparatuses and entered the burning building in an attempt to retrieve the lethal injection chemicals. When they reached the third floor, however, they discovered that the area was being "overtaken by fire," and Captain Kolaja and the unnamed officer fled for their safety.[13]

31.     Captain Kolaja and the officer did not retrieve the lethal injection drugs from the burning Administration Building. Due to the destructive, long-burning fire from which Captain

---

[10] Ex. 5, Brenda Poe, *Walls Unit Damage in Overnight Fire*, The Huntsville Item (Aug. 25, 2023), https://www.itemonline.com/news/walls-unit-damaged-in-overnight-fire/article_9fa1c0a8-4340-11ee-aa57-f735e9eb6f55.html.

[11] *Id.*

[12] Ex. 6, Huntsville Fire Department Report, p. 2.

[13] *Id.*

Kolaja and the officer were forced to flee, that part of the building will, on information and belief, be considered a "total loss."

32.     Building fires create an extreme level of heat. "Fully developed building files can generally attain average gas temperatures throughout the room containing the fire in excess of 1,000 degrees Celsius (1,800 degrees Fahrenheit)."[14]

33.     Features of the Huntsville Unit building would have increased, on information and belief, the internal temperatures even higher than average:

    a.  The Huntsville Unit building had a clay-tile roof, which trapped the fire within the building and made it harder for firefighters to control it. In addition, firefighters had trouble accessing the necessary areas of the fire due to "building construction," key-locked doors, and the size and strength of the fire; and outside water hoses could not get close enough to the affected area.[15]

    b.  The fire burned and spread for over four hours before firefighters could bring it under control – and then continued to burn in numerous "hot spots" for another five hours after that.[16]

---

[14] Ex. 7, Milke et al., Overview of Fire Protection in Buildings, Federal Emergency Management Agency, at A-17, available at https://www.fema.gov/pdf/library/fema403_apa.pdf.

[15] Ex. 6, Huntsville Fire Dept. Rpt., p.2 ("Due to building construction and heavy fire, crews had difficult time making access. This was a prison unit with multiple keys needed for access and control to each area. After L624 and L614 flowed water for some time there was some control of the fire."); id. ("The water was partially successful in limiting the spread, however, the Spanish roofing tiles limited the water to reach all the fire. Also, the distance from the ladder tip to the admin building was farther than an effective water stream from the ladder truck."); id. at 3 ("Suppression Factor: Building construction or design, other, Roof collapse, Egress/exit problem").

[16] Ex. 8, Poe, Inmates Evacuated Because of Fire at Texas Prison Unit; Ex. 6, Huntsville Fire Dept. Rpt., p.3.

      c.   The building was slated for major code-compliance upgrades – which had not yet begun – after the State Fire Marshal found "nearly 1700 violations," including failures to test "fire doors, dampers, or standpipe systems."[17]

34.    When exposed to high temperatures, pentobarbital suspensions quickly degrade, impacting the pH and causing insoluble precipitates to form. In other words, solid particles separate from the liquid in a vial, compromising the consistency of the chemical throughout the suspension.[18] Furthermore, pentobarbital's chemical structure can change, turning into an entirely different substance with a different pharmacological impact on the body.[19] For example, when pentobarbital is "heated to decomposition it emits toxic fumes of nitric oxide."[20]

35.    Vials containing compounded pentobarbital – the type of pentobarbital at issue here – should be stored either at room temperature (20-25 degrees Celsius), refrigerated (at 2-8 degrees Celsius), or in a freezer (at -25 to -10 degrees Celsius).[21] When exposed to much lower temperatures than a fire – those of 100°C (212°F) – and for only a single hour, chemical changes cause pentobarbital to lose 80 percent of its potency.[22] Pharmacological authorities warn that compounded pentobarbital should be used within *48 hours if stored at room temperature.*[23]

---

[17] Ex. 9, Ken Miller, All Prisoners Accounted For After Fire at Texas Prison Forces Evacuation, NBCDFW (Aug. 25, 2023), available at https://www.nbcdfw.com/news/local/texas-news/all-pris-oners-accounted-for-after-fire-at-texas-prison-forces- evacuation/3324120/.

[18] *See* Ex. 10, Report of Dr. Almgren ¶ 31 ("The changes in pH can lead to formation of precipitant.").

[19] *Id*. ("Also, exposure of pentobarbital to pH outside of the acceptable range can lead to quicker breakdown of the pentobarbital molecule itself, producing further degradation[.]"). Mr. Speer intends to file a supplemental scientific report further supporting these allegations.

[20] Ex. 11, NIH National Library of Medicine, PubChem: Pentobarbital (Compound), available at https://pubchem.ncbi.nlm.nih.gov/compound/Pentobarbital#section=Decomposition, citing authorities.

[21] Ex. 12, Addendum to Rpt. of Dr. Almgren ¶ 6.

[22] *See* Ex. 13, Myriam Ajemni et al., *Stability-Indicating Assay for the Determination of Pentobarbital Sodium in Liquid Formulations*, Int'l Journal of Analytical Chemistry, 2015, at 3.

[23] Ex. 10, Almgren Rpt. ¶ 15.

36.     The pentobarbital stored at the Huntsville prison was undoubtedly exposed to temperatures exceeding those at which the chemical can be safely stored, leading to chemical changes, degradation of active ingredients, and alterations in the medication's composition.[24] Further, the seals of the drug vial caps stored in the Huntsville facility were likely compromised in the extreme heat, allowing water to infiltrate the vials.[25]  Once water enters medication vials, it can chemically react with the active ingredients, rendering them less effective.[26]

### 2.     Even Before the Fire, All of TDCJ's Execution Drugs Had Expired.

37.     Other problems with TDCJ's pentobarbital predated the Huntsville Unit fire, and those issues and the fire's damage amplify one another.

38.     Since September 2013, TDCJ has acquired and carried out executions with compounded – as opposed to commercially manufactured – pentobarbital.

39.     TDCJ conceals the identity of the pharmacy and laboratory it uses to compound and test the pentobarbital for use in executions.

40.     When a drug is commercially manufactured, it is subjected to extensive quality control and testing to ensure that the quality, potency, and purity of the drug is stable until its expiration date.[27]  These measures are product-specific.[28]

41.     On the other hand, when drugs are compounded, pharmacists use Active Pharmaceutical Ingredients ("APIs") to prepare smaller batches of a medication.[29] APIs are active drug ingredients, usually in a concentrated powder form.[30]

---

[24] Ex. 12, Addendum to Rpt. of Dr. Almgren ¶ 6.
[25] *Id.* ¶ 8.
[26] *Id.*
[27] Ex. 10, Almgren Rpt. at ¶ 6.
[28] *Id.* at ¶ 7.
[29] *Id.* at ¶ 8.
[30] *Id.*

42.     Generally, drugs are compounded by specialized compounding pharmacies, with very specific – and sterile – equipment and procedures.[31] Sterile compounding must follow the strict guidelines set forth in the United States Pharmacopeia ("USP").[32] USP is a compendium of quality requirements, specifications, and practices that apply to the practice of the pharmacy. USP sets the standards for the pharmaceutical industry.[33]

43.     If drugs are manufactured without compliance with the USP guidelines, they can be contaminated and can cause patient harm and unpredictable drug effects.[34]

44.     The expiration date or Beyond Use Date ("BUD") of a compounded drug is significantly shorter than the BUD of a commercially available equivalent because compounded drugs do not undergo the same extensive quality testing as commercially available products. The USP directs how pharmacists are to determine the BUD of a compounded product.[35]

45.     TDCJ purchases compounded pentobarbital for use in executions in batches that have ranged from nine to twenty-four vials. TDCJ stockpiles compounded pentobarbital, meaning that it obtains more pentobarbital than it can reasonably expect to use prior to the BUD of the drug.

46.     According to the USP, the maximum BUD for high-risk compounded sterile preparations, like the pentobarbital in TDCJ's possession, are:

- 24 hours, if stored at room temperature between 20° and 25°C;

- 72 hours, if refrigerated at a temperature range between 2° and 8°C; or

- 45 days, if in a solid, frozen state between -25° and -10°C.[36]

---

[31] *Id.*
[32] *Id.* at ¶ 9.
[33] *Id.* at ¶¶ 9, 11.
[34] *Id.* at ¶ 11.
[35] *Id.* at ¶ 10.
[36] *Id.* at ¶¶ 10, 14-15.

47.     It appears that TDCJ stores the compounded pentobarbital at room temperature.[37] The USP's BUD of TDCJ's pentobarbital is thus 24 hours. In other words, TDCJ's pentobarbital expires 24 hours after it is compounded because it is kept at room temperature. If it were kept frozen, it would expire 45 days after it is compounded.

48.     At the time of filing this Complaint, some of TDCJ's vials of pentobarbital are over **900 days old**[38]; and the rest of TDCJ's vials of pentobarbital are over **250 days old**.[39]   Based on the available evidence, TDCJ does not possess any pentobarbital that was not long-ago expired, even before taking into account the effect of the August 25, 2023 fire.

49.     TDCJ also does not obtain or receive a prescription from a medical practitioner when ordering pentobarbital for use in executions.

50.     TDCJ purchases compounded pentobarbital for use in executions in batches that have ranged from nine to twenty-four vials.

51.     TDCJ stockpiles compounded pentobarbital, meaning that it obtains more pentobarbital than it can reasonably expect to use prior to the pentobarbital's BUD.

---

[37] *See* Ex. 14, Lab Reports.

[38] According to TDCJ's historical disclosures, TDCJ last received its 50ml vials of pentobarbital on March 18, 2021. Ex. 15, Huntsville Unit Storage Inventory Logs, Pentobarbital (2.5 grams). *See also* Ex. 16, DEA Forms; Ex. 10, Almgren Rpt. at ¶ 17.

[39] TDCJ last received its 100ml vials of pentobarbital on January 5, 2023. Ex. 17, Huntsville Unit Storage Inventory Logs, Pentobarbital (5 grams). *See also* Ex. 16, DEA Forms; Ex. 10, Almgren Rpt. at ¶ 18.

**3.     TDCJ Has Not Performed Necessary Testing to Prove Its Execution
Drugs Are Not Compromised.**

**a)     TDCJ Laboratory Reports of Potency Testing on
Pentobarbital Vials Following the Fire Do Not Demonstrate the
Drugs Are Untainted.**

52.     TDCJ recently produced laboratory reports testing the potency of two vials of
pentobarbital in its possession as of September 21, 2023, following the August 25 fire.[40] However,
given the variability in exposure to extreme heat, water, and smoke that is created in the chaos of
an uncontrolled fire, testing a few vials from a group of vials is inadequate to confirm the safety
or effectiveness of the entire group.[41] For example, some vials may have been closer to the sources
of heat, water or smoke than others. Fires themselves can have varying temperature gradients and
affect different parts of a structure or materials unevenly.[42] Even among the two reports produced
by the TDCJ, the vials showed significant variability, ranging from 94.2% to 100% potency.[43] Far
from putting the issue to rest, this evidence confirms that the levels of breakdown in the
pentobarbital samples vary greatly.

53.     Additionally, the reports produced by the TDCJ do not test for the full quality-
control parameters as required by the USP for all medications.[44] The additional parameters of pH
and visual appearance must be tested. If a sample's pH is outside the specified range for
pentobarbital (between 9.0 and 10.5), the sample would be deemed unsafe and could cause
unpredictable effects.[45] Further, a visual inspection could detect the presence of precipitates, solid
particles that are the most common sign of drug degradation. Particularly for injectable drugs,

---

[40] Ex. 18, Post-Fire Lab Reports of Two Vials of Pentobarbital.
[41] Ex. 12, Almgren Add. ¶ 9.
[42] *Id.* ¶ 10.
[43] *Id.*
[44] *Id.* ¶ 12.
[45] *Id.*

precipitates could occlude blood vessels or arteries and pose serious risks of undue pain and suffering.[46]

54.     Lastly, the reports produced by TDCJ demonstrate that the State used inadequate methods to test sterility and potency.[47] The TDCJ Reports rely on a sterility test labeled ScanRDI, which is deemed inappropriate and inadequate by the FDA unless the lab using the testing can verify proper validation and methodology.[48] Further, to test the potency of drugs exposed to extreme conditions, such as extreme heat, a stability-indicating assay is recommended to ensure that degradation products are detected and quantified.[49] The TDCJ Reports rely on a less sensitive HPLC assay, which most likely overstates the amount of active ingredients.

**b)     TDCJ Potency Testing of Expired Pentobarbital Does Not Extend the Beyond Use Date of the Drugs.**

55.     On several occasions, TDCJ has claimed to "extend" the BUD of its expired compounded pentobarbital based on the results of potency testing. TDCJ has removed a vial of pentobarbital from its existing stockpile and returned the individual vial to the pharmacy.[50] The pharmacy then submits the single vial it receives from TDCJ for potency testing. Potency testing, also referred to as assay testing, measures the amount of API in a sample. This is an unscientific and invalid approach to extending the BUD of a compounded drug.[51]

---

[46] *Id.*
[47] *Id.* ¶ 13-14.
[48] *Id.* ¶ 13.
[49] *Id.* ¶ 14.
[50] *See* Exs. 15, 17, Huntsville Unit Storage Inventory Logs.
[51] Ex. 10, Almgren Rpt. at ¶¶ 21-23.

56.     The only valid way to extend a BUD under the USP is to perform stability-indicating studies.[52] The method used to test the potency of TDCJ's compounded pentobarbital is not a stability-indicating test.[53]

57.     A stability-indicating test, unlike a potency/assay test, can determine whether there has been any degradation of the drug.[54]  Degradants can be structurally similar to the API, and thus misleadingly inflate the results of assay testing. But degradants can have very different chemical qualities than the API, like solubility and pH, which impact the substance's function on the body.[55]

58.     In addition, TDCJ has purported to extend the BUD of multiple vials of its pentobarbital based on potency testing performed on a just one vial. Even if potency testing were a valid basis on which to extend a drug's BUD – which it is not – the USP makes clear that the results of tests conducted post-compounding on one vial are not applicable to other vials (whether from the same or different batches).[56] For example, TDCJ may not extend the BUD of an entire batch of pentobarbital based on a test of a vial or two from that batch.

59.     Contrary to TDCJ's faulty claims that it extends the BUD of the lethal injection chemicals, all the pentobarbital in TDCJ's possession expired long ago.

60.     Finally, vials that TDCJ sends to the pharmacy for this testing are sometimes shipped back to TDCJ afterward, and placed back into storage for future executions. This creates a high contamination risk. Indeed, once a sterile vial is opened for testing, any drug not consumed

---

[52] *Id.* at ¶¶ 23, 25-27.
[53] *Id.* at ¶¶ 23, 25.
[54] *Id.* at ¶¶ 23, 24-26.
[55] *Id.* at ¶¶ 24, 30.
[56] *See id.* at ¶ 28-29.

in testing is supposed to be discarded because of the risk of contamination and the potential for tampering.[57]

61.    In addition to being expired, the pentobarbital in TDCJ's possession was not subject to all of the tests required by the USP.

62.    The pH of pentobarbital shifts over time, which accelerates the break-down of pentobarbital molecules and leads to the formation of precipitants. Exposure to excess temperatures accelerates this process. For this reason, the USP specifies that the pH of compounded pentobarbital should be tested and maintained at between 9.0 and 10.5.[58]

63.    None of the reports TDCJ has produced in the past indicates that the pH of the pentobarbital in TDCJ's possession has ever been tested, nor have the solutions been visually inspected for particulates.[59]

64.    None of the analytical reports TDCJ has produced indicate that any of the pentobarbital has been subject to a visual inspection for particulates as required by USP.[60]

65.    The pentobarbital in TDCJ's possession was tested for sterility, but the wrong methodology was used. The results are therefore not valid under the USP. Even if the sterility test results were valid—which they are not—that testing, along with the other testing completed by TDCJ, cannot extend the BUD of the pentobarbital in TDCJ's possession.

66.    The pharmacological activity of expired drugs – let alone drugs that were exposed to extreme temperatures – is unpredictable. At a minimum, the drugs' effectiveness will have

---

[57] *Id.* at ¶¶ 33-34.
[58] Ex. 10, Almgren Rpt. at ¶ 31.
[59] Ex. 14, Lab Reports.
[60] Ex. 10, Almgren Rpt. at ¶ 31.

vastly decreased.[61] Some drug degradants have their own pharmacological activity, completely different from the original drug.[62] Expired medications can cause severe side effects, such as organ failure.[63] Particulates in an intravenous injection, furthermore, can pose risk of painful pulmonary emboli, hematoma, acute inflammation, or phlebitis.[64] For these and other reasons, the Food and Drug Administration strongly advises against using expired or spoiled medication.[65]

> **4.      The Use of Compromised Execution Drugs Will Cause Severe Harm to Mr. Speer.**

67.      Administering expired and fire-damaged pentobarbital during Mr. Speer's execution is likely to cause unnecessary pain. A drug that has surpassed its BUD is at risk of stability and sterility failings.  According to the USP, such drugs must not be used.[66]

68.      This pain is what the State of Texas guarantees condemned inmates freedom from when guaranteeing freedom from "torture, or ill treatment, or unnecessary pain."[67]

> **C.      Recent Litigation in Texas Court Confirmed Factual Allegations That TDCJ's Drug Supply Was Tainted, But Provided No Relief To Affected Inmates.**

69.      In December 2022, several death-sentenced Texas prisoners filed a state-court civil lawsuit against TDCJ and its officials, alleging that TDCJ's actions in procuring, selecting, storing,

---

[61] *See* Ex. 10, Almgren Rpt. at ¶ 20; Ex. 13, Ajemni et al., at 3 (exposure to 100°C (212°F) for one hour causes pentobarbital to lose 80 percent of its potency).

[62] Ex. 10, Almgren Rpt. at ¶¶ 20, 24, 27.

[63] *Id.* at ¶ 20.

[64] *See, e.g.*, Ex. 19, N. Chiannilkulchai, et al., Safety Concerns with Glass Particle Contamination: Improving the Standard Guidelines for Preparing Medication Injections, Int. J. Qual. Health Care, 33(2) (Jun. 2021), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8221140/#R5; Ex. 20, J.W. Puntis et al., Hazards of Parenteral Treatment: Do Particles Count? Arch. Dis. Child, 67(12), 1475-77 (Dec. 1992) ("Particulate contamination is known to cause phlebitis in peripheral vessels[.]"), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1793986/?page=2.

[65] Ex. 10, Almgren Rpt. at ¶ 20.

[66] *Id.*

[67] Tex. Code Crim. Proc. art 43.24 ("No torture, or ill treatment, or unnecessary pain, shall be inflicted upon a prisoner to be executed under the sentence of the law).

and administering drugs in connection with executions constituted *ultra vires* acts that violated several state laws[68] and would subject the plaintiffs to unnecessary harm.[69]

70.     The District Court held a temporary-injunction hearing on January 10, 2023, to determine whether TDCJ planned to use expired pentobarbital in upcoming executions and whether the use of the expired drugs violated state statutes. The District Court explained that, in accordance with a prior order of the Court of Criminal Appeals,[70] it could not stay any execution, but it could decide whether to enjoin TDCJ "from committing certain acts while conducting the executions."[71]

71.     After a two-and-a-half-hour hearing,[72] the District Court made detailed factual findings, including the following:

    a.     "Defendants' actions in procuring, selecting, storing, and administering Pentobarbital mean that Defendants must comply with the Texas Pharmacy Act[,]"as well as "the Texas Controlled Substances Act, the Texas Food, Drug, and Cosmetic Act, and the Texas Penal Code."[73]

    b.     "Plaintiffs offered unrebutted evidence that all of the Pentobarbital in Defendants' possession is expired."[74]

---

[68] These include the Texas Pharmacy Act, the Texas Controlled Substances Act, the Texas Food, Drug, and Cosmetic Act, and the Texas Penal Code.

[69] Ex. 21, Original Petition, *Ruiz et al. v. TDCJ et al.*, Case No. D-1-GN-22-007149 (345th District Court, Travis County).

[70] Ex. 22, *In re State ex rel. Ken Paxton,* No. WR-94, 432-01, 2023 WL 110625 (Tex. Crim. App. Jan. 4, 2023).

[71] *See* Ex. 23, Temporary Injunction of Travis County Civil District Court, *Ruiz et al. v. TDCJ et al.*, (Jan. 10, 2023).

[72] Ex. 24, Jan. 10, 2023 Hearing Transcript, *Ruiz et al. v. TDCJ et al.*

[73] *Id*. at 2-3.

[74] *Id*. at 3.

    c.   "Plaintiffs offered unrebutted evidence that expired Pentobarbital can cause severe harm or unpredictable drug actions."[75]

    d.   The harms from expired Pentobarbital include "burning pain" and "blockages in the blood vessels [which are] painful[,]" and "Defendants' procedures create a risk of unnecessary pain and unpredictable activity in the body of condemned people."[76]

    e.   "Defendants did not offer any evidence or witnesses to dispute Plaintiffs' assertions regarding Defendants['] practices regarding the legality, purity, stability, or microbiology of the Pentobarbital in Defendants' possession." *Id.*

    f.   Defendants "have handled their pentobarbital with disregard for its purity, stability, and activity in the body in the presence of degradants and contaminants."[77]

72.    Based on these factual findings, the District Court concluded that TDCJ officials were violating the Texas Pharmacy Act, Texas Controlled Substances Act, the Texas Food, Drug, and Cosmetic Act, and the Texas Penal Code by continuing to store and administer these drugs.[78] The District Court then issued a temporary injunction ordering TDCJ officials to temporarily refrain from "administering or injecting Plaintiffs" with expired Pentobarbital.[79]

73.    The Texas Court of Criminal Appeals ("CCA") summarily vacated the District Court's injunction, however, because it "purport[ed] to stay the . . . executions of [various] inmate[s]" and "circumvent[ed] . . . the orders of the inmates' convicting courts," Judge Newell dissented.[80]. He had previously observed that the law "creates a Catch-22 in which death-row

---

[75] *Id.* at 4.
[76] *Id.* at 4-5.
[77] *Id.* at 5.
[78] *Id.* at 2-4.
[79] *Id.* at 6.
[80] Ex. 25, *In re State ex rel. Paxton*, No. WR-94,432-02, 2023 WL 151779, at *1 (Tex. Crim. App. Jan. 10, 2023) (citation omitted))

inmates have a civil remedy to pursue claims regarding the method of execution but may not stop the execution to raise them."[81]

74.     When vacating the injunction, the CCA did not question – let alone reject – the District Court's factual findings that all of the pentobarbital in TDCJ's possession is expired and that it would cause a death-sentenced prisoner unnecessary harm and suffering upon administration. Nor did the CCA question or reject the District Court's legal conclusion that TDCJ officials would violate state law if they used those drugs to carry out a future execution.

75.     Hours after the CCA's ruling, TDCJ officials used expired pentobarbital to execute Robert Fratta. In the following weeks, expired pentobarbital was used in the executions of John Balentine, Wesley Ruiz, and Arthur Brown.

76.     Though the State carried out the execution of these men, the lawsuit – joined by other inmates – remains pending on appeal from the District Court's denial of several defendants' plea to the jurisdiction.[82]

77.     Mr. Speer is not a party to that lawsuit, nor could he obtain relief if he were, because Texas law disentitles him to a temporary injunction for that purpose.[83]

    **D.     Mr. Speer Has Been Denied Adequate Process to Challenge the Deprivation of His Liberty Interest.**

78.     Mr. Speer has been denied any opportunity to verify the status of the pentobarbital supply since the August 25, 2023 Huntsville fire.  Mr. Speer attempted to avail himself of every

---

[81] Ex. 26, *In re State ex rel. Paxton*, 667 S.W.3d 752, 753 (Tex. Crim. App. Jan. 4, 2023) (Newell, J., dissenting).

[82] *See TDCJ et al. v. Canales*, No. 03-23-00248-CV (Tex. App.—Austin) (appellants' brief filed June 15, 2023).

[83] The CCA recently vacated a state civil court's temporary injunction in a suit challenging the use of expired execution drugs because it "purport[ed] to stay the . . . executions of [the various] inmate[s]" and "circumvent[ed] [the CCA's] mandates and the orders of the inmates' convicting courts." *In re State ex rel. Paxton*, 2023 WL 151779, at *1 (citation omitted)).

state-law procedure and has been met with obstruction by the TDCJ and dismissal by the Texas state courts without any discovery, notwithstanding that TDCJ has not disputed the allegations concerning the pentobarbital supply (such as that it is long-expired and that it was subject to excessive heat, smoke, and water as a result of the Huntsville fire).

>    1.    **TDCJ Is Obstructing Mr. Speer's Discovery of the Fire's Impact on the Drugs Defendants Will Use to Execute Him Through Public Information Act Requests.**

79.    Mr. Speer's attempts to gather information about the condition of the substances intended for use in his execution in the wake of the Huntsville Unit fire have been met with delay and obstruction by TDCJ.

80.    On September 18, 2023, once the extent of the fire and damage became clearer, counsel for Mr. Speer sent to the TDCJ via email transmission a Public Information Act ("PIA") request seeking information about whether and how the lethal-injection substances stored at the Huntsville Unit were affected by the fire.[84]

81.    Mr. Speer further requested information about the specific substance TDCJ intended to use in his execution.[85]

82.    TDCJ responded on September 26, 2023, but did not provide any responsive documents concerning the August 25 fire and stated it "has not yet determined the specific pentobarbital to be administered to your client."[86] TDCJ advised counsel that they would be seeking a Request for Decision from the Office of the Attorney General ("OAG"), invoking every possible exception available under the PIA for withholding the information about the fire.[87]

---

[84] *See* Ex. 27, PIA Request of Sept. 18, 2023.
[85] *Id.*
[86] See Ex. 28, PIA Email Response from TDCJ Office of General Counsel, Sept. 26, 2023.
[87] *Id.*; Ex. 29, Notification of Request for Decision, Sept. 26, 2023.

83.     On September 27, TDCJ filed a letter brief identifying three grounds for maintaining confidentiality. None of these provisions appear to pertain to the withholding of information about the August 25 fire. Specifically, TDCJ invoked:

      a.   Texas Government Code § 552.101, which excepts information made confidential, inter alia, by judicial decision and common law; and

      b.   Texas Government Code § 552.1081, which excepts from disclosure information about certain people who participate in an execution procedure and "any person or entity that manufactures, transports, tests, procures, compounds, prescribes, dispenses, or provides a substance or supplies used in an execution";

      c.   Texas Government Code § 552.136, which excepts confidential financial-transaction information.[88]

84.     In a related PIA request, the late Jedidiah Murphy, who was executed on October 10, 2023, requested information regarding the specific location where the drugs intended for use in lethal-injection executions are kept and particularly where they were kept on August 24 and August 25, 2023, i.e., around the time of the fire.[89] TDCJ provided no responsive information in response to Murphy's request. Instead, TDCJ defended its withholding of documents by filing the same written comments to OAG.[90]

85.     Neither Mr. Speer nor his counsel delayed in seeking the information, as neither the relevance of the fire nor the extent of its damage was immediately clear. The critical nature of the information Mr. Speer seeks – whether a catastrophic event significantly denigrated the

---

[88] See Ex. 30, Letter Brief Regarding Speer PIA Request.
[89] See Ex. 31, PIA Correspondence Between Jedidiah Murphy and TDCJ at 1.
[90] *Id.* at 6-7.

substances TDCJ intends to use to carry out his execution – cannot be overstated.  TDCJ's response is simply obstructionist, adding to the necessity of this Court's action.

### 2.   TDCJ Has Also Refused to Provide Information About the Fire's Impact on Execution Drugs in Response to Mr. Speer's Administrative Grievances.

86.   On September 18, 2023, Mr. Speer filed a Step 1 grievance with TDCJ, objecting to the use in his execution of drugs affected by the August 25 fire.

87.   On October 5, 2023, the prison denied the grievance, stating: "[A]n investigation was conducted. TDCJ confirmed there was no impact to the drugs used to perform executions.  No further action is warranted."

88.   The response did not describe who undertook the investigation or why, on whose order it was commenced, what steps were undertaken to conduct the investigation, or the specific, actual findings of the investigation (beyond a conclusory assertion of "no impact").

89.   Mr. Speer immediately filed a Step 2 grievance on October 6, 2023 seeking review of the decision.  A decision has not been made on this grievance.

### 3.   Mr. Speer Cannot Obtain Relief from the Texas Courts.

90.   On October 4, 2023, Mr. Speer filed a 70-page Application for Writ of Habeas Corpus in Texas state court, filed under Texas Code of Criminal Procedure Article 11.05.[91]

91.   Despite the fact that the Application raised several non-frivolous statutory and constitutional claims, the Texas state court denied Mr. Speer's application on October 12, 2023 in a two-page order without giving any consideration to certain of Mr. Speer's arguments.[92]

---

[91] Ex. 32, Oct. 4, 2023 Application for Writ of Habeas Corpus.
[92] Ex. 33, *Ex parte Speer*, No. 99F0506-005 (Tex. 5th. Dist. Oct. 12, 2023).

92.     In this order, the trial court denied relief summarily based on a citation to the Eighth Amendment standard alone, without a hearing and without addressing Mr. Speer's claim under the Texas Constitution.[93]

93.     Neither the State's Response nor the Order of the trial court contains any acknowledgement of the factual dispute that must be resolved to guarantee Mr. Speer his liberty interest, that is, the dispute concerning the effects of the fire on the State's supply of pentobarbital.

94.     Mr. Speer's claims require a court to develop a factual record, hear evidence, and make factual determinations.

95.     On October 16, 2023, Mr. Speer filed a 62-page Application for Writ of Habeas Corpus in the Texas Court of Criminal Appeals, filed under Article I, § 12 of the Texas Constitution and Texas Code of Criminal Procedure Article 11.05.  This matter is pending in the Texas Court of Criminal Appeals.

96.     There is no other means through which Mr. Speer can challenge the deprivation of his liberty interest in Texas courts:

      a.  The Texas criminal courts will not recognize such claims in a subsequent state habeas writ brought under Article 11.071[94];

---

[93] *Id.*

[94] Article 11.071 applies only if a death-sentenced "applicant seeks relief from [the] judgment imposing a penalty of death." Tex. Code Crim. Proc. art. 11.071, § 1. A challenge to an execution procedure is thus not cognizable under Article 11.071 because it does not seek relief from the judgment of conviction or sentence of death. *Ex parte Alba*, 256 S.W.3d 682, 686 (Tex. Crim. App. 2008) (plurality op.) (holding that "Article 11.071 is not the proper avenue for relief" to challenge a lethal-injection protocol); *id.* at 689 (Cochran, J., concurring) ("This is a circumstance-of-punishment allegation. . . .  [I]t is not a challenge to the conviction or sentence."). Judge Cochran's concurring opinion, joined by Judge Womack, states the narrowest grounds for the decision in *Alba. See id.* at 687 ("Although I agree with the [plurality opinion] that applicant's claim is not cognizable under Article 11.071, I believe that a 'lethal-injection protocol' claim may be brought as an original writ application under the Texas Constitution[.]").

b. Nor can Mr. Speer obtain a full and fair consideration of the merits by way of Article 11.05 or Article I, Section 12 of the Texas Constitution because he was denied an opportunity for factual development and a hearing[95];

c. No other specific procedure in Chapter 11 applies, because the action does not "involve a final felony conviction, . . . a case in which probation was imposed, or a felony case after indictment"[96]; and

d. The Texas civil courts do not have the authority to stop an execution in order to entertain these legal claims, no matter what title is assigned to the request (a stay of execution,[97] a writ of prohibition,[98] or a temporary injunction[99]).

## CLAIM FOR RELIEF

**I.     TEXAS HAS DEPRIVED MR. SPEER OF HIS LIBERTY INTEREST WITHOUT ADEQUATE PROCESS, IN VIOLATION OF THE PROCEDURAL DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.**

97.     Mr. Speer realleges and incorporates by reference the allegations contained in the above paragraphs.

---

[95] Mr. Speer filed an original constitutional habeas writ, under Article 11.05 and Article I, Section 12, of the Texas Constitution, in the Bowie County District Court, which the court summarily denied. Mr. Speer cannot effectively appeal the court's denial because, unlike the civil district court, the intermediate court that would consider the appeal arguably cannot stay his execution. Mr. Speer's execution is still scheduled for October 26, 2023, with the damaged pentobarbital that is the subject of this federal complaint.

[96] *In re Smith*, 665 S.W.3d 449, 455 (Tex. Crim. App. 2022).

[97] *See State ex rel. Holmes v. Third Court of Appeals*, 885 S.W.2d 389, 395-96 (Tex. Crim. App. 1994) (original proceeding) (holding that an order by a state civil court purporting to stay an execution unlawfully circumvents the jurisdiction of the Court of Criminal Appeals in a death-penalty case); *Alba*, 256 S.W.3d at 690 & n.19 (Cochran, J., concurring) (noting the "inability of a Texas civil court to enjoin the carrying out of a lawful criminal sentence in the context of a civil-rights lawsuit" and citing *Holmes*, 885 S.W.2d at 395-96).

[98] *Ex parte Chi*, 256 S.W.3d 702, 704 (Tex. Crim. App. 2008).

[99] *See* ¶ [80] *infra*.

98.     The Fourteenth Amendment provides that "[n]o State shall…deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. The liberty interest protected by the Fourteenth Amendment "may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,'…or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

99.     The State's use of expired and fire-damaged drugs deprives Mr. Speer of his state-created liberty interest under Article 43.24, which guarantees condemned prisoners freedom from the infliction of torture, unnecessary pain, and ill treatment.

100.    Because Texas affords Mr. Speer no bona fide, meaningful way to challenge that deprivation, Texas deprives him of the required due process. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)[100]:

    a.  First, Mr. Speer's interest in his right to be free from "torture, or ill treatment, or unnecessary pain," Texas Code of Criminal Procedure, Article 43.24, is substantial.

    b.  Second, the risk of erroneous deprivation is equally great. With no ability to prevent the use of tainted, expired pentobarbital to conduct his execution, Mr. Speer will be able to confirm his torture, ill treatment, or unnecessary pain only as the lethal injection enters his body, at which time it will be far too late.

    c.  Third, the State offers no justification for its failure to afford minimum procedures to allow Mr. Speer to protect his interest, including its refusal to notify Mr. Speer of the provenance and condition of the drug it intends to use in his execution.

---

[100] The *Mathews v. Eldridge* inquiry would apply here as per the Supreme Court's ruling in *Nelson v. Colorado*, 581 U.S. 128, 134-35 (2017) ("These cases, in contrast, concern the continuing deprivation of property after a conviction has been reversed or vacated, with no prospect of reprosecution….Because no further criminal process is implicated, *Mathews* "provides the relevant inquiry.") (citation omitted).

101.     Additionally, the State's denial of a remedy to Mr. Speer for actions that directly violate Article 43.24 of the Texas Code of Criminal Procedure clearly "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental fairness in operation." *Osborne*, 557 U.S. at 62 (citing *Medina v. California*, 505 U.S. 437, 446, 448 (1992)).  By sending multiple requests for information to the TDCJ and filing an application for an original writ of habeas corpus in Texas state court, all to no avail, Speer has demonstrated the inadequacy of the state-law procedures available to him. *See Osborne*, 557 U.S. at 71 (explaining that it is "[Respondent's] burden to demonstrate the inadequacy of the state-law procedures available to him in state postconviction relief.").

102.     For these reasons, the State's continual denials of Mr. Speer's requests for information or for a forum in which to conduct a factual inquiry into the integrity of the pentobarbital supply in the wake of the Huntsville fire violates the Fourteenth Amendment's guarantee of procedural due process.  *See Fuentes v. Shevin*, 407 U.S. 67, 80 ("For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard.'" (quoting *Baldwin v. Hale*, 1 Wall. 223, 233, 17 L.Ed. 531 (1863))); *Greenholtz*, 442 U.S. at 16 (holding that because "Nebraska procedure affords an opportunity to be heard, and when parole is denied it informs the inmate in what respects he falls short of qualifying for parole; this affords the process that is due under these circumstances.").

**PRAYER FOR RELIEF**

103.     WHEREFORE, Plaintiff prays that the Court provide the following injunctive and declaratory relief:

     a.  Grant a preliminary injunction of Defendants' use of drugs affected by the August 25, 2023 Huntsville Unit fire in Plaintiff's imminent execution;

b.  Grant a preliminary injunction of Defendants' use of expired drugs in Plaintiff's imminent execution;

c.  Compel immediate disclosure/discovery of the documents Defendants have refused to provide to Plaintiff's counsel regarding the effects of the Huntsville Unit fire, or alternatively submission to the Court for *in camera* inspection;

d.  Declare that Defendants' use of expired drugs and drugs affected by the August 25, 2023 Huntsville Unit fire would violate Plaintiff's protected liberty interests as discussed in this Complaint;

e.  Permanently enjoin Defendants from using such drugs in Plaintiff's execution; and

f.  Grant such other relief as this Court deems proper and just.


Respectfully submitted,

*/s/ Joshua Freiman*

Maureen Scott Franco
Federal Public Defender
Western District of Texas

Joshua Freiman
Fed Bar No. 3342395
NY Bar No. 5353545
Donna Coltharp
Assistant Federal Public Defenders
919 Congress Ave., Ste. 950
Austin, Texas 78701

*Counsel for William Keith Speer*