**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **WILLIAM KEITH SPEER,** | § | **CASE NO. 4:23-cv-3958** |
| *Plaintiff*, | § | |
| | § | **THIS IS A CAPITAL CASE** |
| **v.** | § | |
| | § | **EXECUTION SET FOR** |
| **BOBBY LUMPKIN, Director, et al.,** | § | **OCTOBER 26, 2023** |
| *Defendants.* | § | |

## PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

On October 20, 2023, this Court entered an order directing Mr. Speer to "file any motion for preliminary injunction or stay of execution on or before Monday, October 23, 2023 at 8:00am." Order, ECF No. 9. Mr. Speer files this emergency motion requesting this Court to issue a preliminary injunction.[1]

On October 26, Mr. Speer is scheduled to be executed by the State of Texas with a lethal quantity of pentobarbital. Texas law provides Mr. Speer the rights to be free from "torture," "ill treatment," and "unnecessary pain." Tex. Code Crim. Proc. art. 43.24. But available evidence strongly indicates the State will deprive Mr. Speer of these rights by injecting him with unlawfully obtained, long-expired drugs that have been chemically altered due to exposure to extreme heat, smoke, and water from an unprecedented, catastrophic fire at the prison where the drugs are stored.

This year, five other prisoners have been executed using the illegally obtained and expired

---

[1] Mr. Speer believes a preliminary injunction is the appropriate remedy for his particular circumstances. However, in the event this Court believes a stay of execution is appropriate, Mr. Speer also satisfies standard for a stay of execution, which is identical to the standard for a preliminary injunction. *See Sells v. Livingston*, 561 F. App'x 342, 344 (5th Cir. 2014).
Pursuant to this Court's Order, he separately files an update on litigation in state court related to matters raised in the instant lawsuit.
He incorporates by this reference the exhibits to the complaint, referred to here as "Pl. Ex."

drugs after unsuccessful attempts to vindicate their rights in multiple courts.[2] When the first set of prisoners raised their claims—before the drugs had been further contaminated by the fire—a civil district court held a three and a half hour hearing, *see generally* Pl. Ex. 24, and found that the plaintiffs had presented substantial and "unrebutted evidence" that the drugs in TDCJ's possession were expired and using them in executions would violate a host of Texas laws, including Texas Code of Criminal Procedure Article 43.24. Pl. Ex. 23 at 3, 4, 5, 6 fn. 2. The court explicitly stated that TDCJ "failed to provide evidence or testimony to contradict Plaintiff's evidence that the expired Pentobarbital will likely cause such torture, ill treatment, or unnecessary pain." Pl. Ex. 23 at 4. As a result, the court issued a temporary injunction preventing Texas from using those drugs in executions. Pl. Ex. 23. The Texas Court of Criminal Appeals (CCA), however, vacated that injunction, holding that the civil court that heard their claims did not have jurisdiction to issue relief that could have the effect of staying an execution.[3] Pl. Ex. 25. In the opinion of one dissenting judge, "this creates a Catch-22 in which death-row inmates have a civil remedy to pursue claims regarding the method of execution but may not stop the execution to raise them." Pl. Ex 26 at 1. Several of the prisoners then sought relief by moving to withdraw their execution warrants in the trial courts where their convictions originated, but those courts, too, found they were without

---

[2] *See* TDCJ, Death Row Information - Executed Inmates, https://www.tdcj.texas.gov/death_row/dr_executed_offenders.html (noting the executions of Robert Fratta, John Balentine, Wesley Ruiz, Arthur Brown, Jr., and Jeddidiah [*sic*] Murphy).

[3] Notably, the CCA implied that, though the civil court did not have jurisdiction to enter a preliminary injunction that prevented TDCJ from carrying out scheduled executions, the civil court did have jurisdiction to consider the merits, hold a hearing, and make factual findings. Though TDCJ defendants filed a writ of mandamus in the CCA arguing the civil court did not have jurisdiction to hear a case involving a criminal matter, the CCA issued an order directing the civil court, not to dismiss the case for lack of jurisdiction, but to "refrain from issuing any order purporting to stay the…executions." Pl. Ex. 22.

jurisdiction to provide the necessary relief.[4]

Mr. Speer has attempted to obtain specific information about how the fire affected the drugs—the same information Mr. Murphy was denied—through the TDCJ grievance procedure and Public Information Act ("PIA") requests. Compl. ¶¶ 80-81, 84, ECF No. 1; Pl. Ex. 27; Pl. Ex. 31. But TDCJ refused to provide requested information about where the drugs were located at the time of the fire and have not tested the potency of the specific drugs they plan to use on Mr. Speer. Compl. ¶¶ 82-83, Ex. 28-29. Instead, TDCJ asserted—without providing evidence—that an investigation was conducted and the drugs were not affected by the fire. Compl. ¶ 87. Just as TDCJ's repeated claims that its drug supply was not expired could not be trusted before a court held a hearing and found unrebutted evidence that the drugs were, in fact, expired, TDCJ's claims that its drugs were not affected by the fire also cannot be trusted. Consequently, Mr. Speer filed a complaint in this Court under 42 U.S.C. § 1983, contending that Defendants Collier, Lumpkin, and Strong—the TDCJ officials responsible for carrying out executions—have not provided adequate procedures for him to vindicate his rights under Texas law. *See generally* Compl. This Court should enjoin  Defendants from executing Mr. Speer until they have provided him the minimally adequate procedures necessary to ensure his right to be free from torture, ill-treatment, and unnecessary pain.

Mr. Speer fully satisfies the preliminary injunction standard on the papers alone. A

---

[4] *See e.g.*, Ruiz Mot. Withdraw Execution Date (Prelim. Inj. Exhibit 1); Fratta Mot. Withdraw Execution Order (Prelim. Inj. Exhibit 2).  In Robert Fratta's case, a Harris County district court, during a hearing on the motion, stated it did not believe the civil court overstepped its jurisdiction in issuing the temporary injunction, and suggested that the CCA erred in vacating civil court's injunction. Fratta Mot. Withdraw Hr'g Tr., Jan. 10, 2023  (Prelim. Inj. Exhibit 3).  The criminal district court concluded, however, that it lacked jurisdiction to correct that mistake by withdrawing Robert Fratta's execution date because such relief was not expressly provided for under Texas Code of Criminal Procedure article 43.141(d). *Id.* at 13-14.

proposed preliminary injunction order is attached. But if the Court has any doubt, Mr. Speer respectfully requests that this Court hear argument on his request.

**STATEMENT OF FACTS**

The protocol governing Mr. Speer's execution requires a lethal injection of five grams of the drug pentobarbital. Compl. ¶ 16, Pl. Ex. 4 at 10. TDCJ stores its pentobarbital in a pharmacy on the third floor of the Administration Building at the Huntsville Unit. Compl. ¶¶ 2, 29; Pl. Ex. 15, 17 ("Huntsville Unit" Inventory Logs). On the morning of August 25, 2023, a catastrophic fire broke out at that Unit and burned for as many as ten hours, causing serious damage to the third floor of the Administration building. Compl. ¶ 23; Pl. Ex. 12, ¶ 4. *See* Photograph of Damage to Huntsville Unit Administrative Building (Prelim. Inj. Exhibit 4).

According to a report written by Captain Jon Brandon Kolaja, an unnamed correctional officer approached him during the fire and asked him to "check on the pharmacy." Compl. ¶ 29; Pl. Ex. 6. When the C.O. and firefighter reached the third floor, they discovered that the area had been overtaken by fire, and they fled the building. Compl. ¶ 29; Pl. Ex. 6. They did not retrieve the lethal injection drugs. Compl. ¶ 31.

The drugs the correctional officer tried to save were expired. The pentobarbital that TDCJ stores and uses for executions is compounded. Compl. ¶ 45. Compounded pentobarbital expires, or exceeds its "Beyond Use Date" (BUD) after anywhere from 24 hours (stored at room temperature) to 45 days (frozen). Compl. ¶¶ 44, 46; Pl. Ex. 10, at ¶ 15; Pl. Ex. 24, at 43-45. TDCJ stockpiles more batches than can be used before its BUD. Compl. ¶¶ 44-45. At the time Mr. Speer filed his complaint, some of the vials were more than 900 days old, and the remaining vials were more than 250 days old—in other words, all of TDCJ's pentobarbital exceed its BUD. Compl. ¶ 48; Pl. Ex. 10 ¶ 14; Pl. Ex 24, at 44-47, 81. According to pharmacy expert Michaela Almgren, "A drug that has surpassed its BUD is at risk of stability and sterility failings and may not retain

sufficient potency, thus it must not be used." Pl. Ex. 10 ¶ 20.

On several occasions, TDCJ has claimed to "extend" the BUD date based on potency testing alone. Compl. ¶ 55; Pl. Exs. 15, 17; Pl. Ex. 10 ¶¶ 17-18, 21; Pl. Ex. 24 at 46, 50. But "this approach to extending BUD is completely unscientific and incorrect", Pl. Ex. 10 ¶ 21, and therefore "completely inappropriate." Pl. Ex. 24 at 47. First, TDCJ utilizes a "technology that provides quicker turn around" for potency testing, but "is not as accurate." Pl. Ex. 24, at 48. Second, the only valid testing to establish an extended BUD is a stability-indicating test, which TDCJ does not do. Compl. ¶ 57; Pl. Ex. 10 ¶¶ 21-23, 25-27; Pl. Ex. 24 at 46-47, 50-51; Pl. Ex 12 ¶ 14.

Further, TDCJ's drug supply is not subjected to tests required by the United States Pharmacopeia (USP). Compl. ¶¶ 62-64; Pl. Ex. 24 at 47-48. For example, the USP requires compounded pentobarbital to be tested for adequate pH levels and visually inspected for the presence of precipitants, or solid compounds that form in the solution, neither of which TDCJ does. Compl. ¶¶ 53, 63; Pl. Ex. 24 at 47-48; Pl. Ex 10 ¶ 31; Pl. Ex. 12 ¶¶ 12-13. Visual inspections can have profound results. In Georgia, for example, visual inspection of compounded pentobarbital on the eve of the execution of a condemned woman revealed the presence of solid "particles floating in the syringe" and caused prison officials to postpone the execution. Chris McDaniel, *Georgia Says "Cloudy" Execution Drug Was Just Too Cold, But Expert Gave A Second Possible Cause*, Buzzfeed News (Mar. 11, 2015), https://www.buzzfeednews.com/article/chrismcdaniel/georgia-says-cloudy-execution-drug-was-just-too-cold-but-exp/;  Image of Syringe with "Cloudy" Pentobarbital (Prelim. Inj. Exhibit 5).

Fire damage and time change the chemical character of pentobarbital. Pl. Ex. 10 ¶ 27; Pl. Ex. 12 ¶ 6. High temperatures cause the active ingredients of the drug to quickly degrade, affecting the pH level and causing insoluble precipitates, or solid particles, to form. Compl. ¶ 34; Pl. Ex. 12

¶¶ 6-7. The drug's chemical structure can change as well, turning into an entirely different substance. *Id.* The emergency rescue efforts to combat the fire are significant as well, as light and water exposure can also "cause the medication to change its chemical composition resulting in reduction of the drug's potency." Pl. Ex. 12 ¶ 8. "High temperatures caused by the fire likely resulted in the loss of vial cap seal[,] compromising the integrity of the closures and allowing water to infiltrate the vials." *Id*. Changes in the chemical composition of the drug caused by heat, smoke, light, and water are likely to cause unnecessary pain to Mr. Speer—including "burning pain" and painful "blockages in the blood vessels." Compl. ¶¶ 67, 71(d); Pl. Ex. 24 at 32-33, 49.

For these reasons, Mr. Speer has made numerous attempts to verify the damage done to TDCJ's pentobarbital by the fire and learn further information about the character and quality of the expired pentobarbital. Compl. ¶¶ 78-93. He has gathered information about the fire from emergency first-responders. Pl. Ex. 6. He and other prisoners have made numerous attempts to obtain information under the Public Information Act. Compl. ¶¶ 79-85; Pl. Exs. 27-31. He has tried to exhaust his administrative remedies as quickly as possible, but the procedures are not capable of providing relief given his impending execution date. Compl. ¶¶ 86-89. He has gone to state court, in attempts to assert his rights, under state and federal law, not to suffer excessive pain, torture or ill treatment during his execution. Compl. ¶¶ 95-96; Pl. Ex. 32. TDCJ has denied and obstructed his attempts to gather information, Compl. ¶¶ 79-93, and the courts have so far barred him from relief and/or refused to permit him to develop facts necessary to present his claim. Compl. ¶ 91-96; Pl. Ex. 33.

Mr. Speer is scheduled to be executed in four days, and now moves for entry of a preliminary injunction to enjoin TDCJ from executing him unless and until TDCJ provides the necessary information to Mr. Speer to evaluate whether the drugs it intends to use on him will

result in torture, ill treatment, or unnecessary pain.

## **ARGUMENT**

To obtain a preliminary injunction, a plaintiff must show that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *Nken v, Holder*, 556 U.S. 418, 434 (2009). Irreparable harm and likelihood of success are "the most critical" factors in whether a preliminary injunction is warranted. *Nken,* 556 U.S. at 434. Since the purpose of a preliminary injunction is limited to preserving the relative positions of the parties until a trial on the merits can be held, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

## I.     **Mr. Speer Is Likely To Succeed on the Merits of His Due Process Claim.**

Mr. Speer makes a strong showing of a likelihood of success on the merits. To meet his burden on the first factor, Mr. Speer acknowledges that more than the mere "possibility" of relief is required.  *Nken*, 556 U.S. at 434 (citation omitted). "Substantial grounds [upon which relief might be granted] exist if an issue is 'debatable among jurists of reason' or is otherwise 'adequate to deserve encouragement to proceed further.'" *Lackey v. Scott*, 885 F. Supp. 958, 964 (W.D. Tex. 1995) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4, 895 (1983)).

The Fourteenth Amendment to the United States Constitution provides, in relevant part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV. A procedural due process claim consists of two elements: 1) deprivation by state action of a protected interest in life, liberty, or property, and 2) inadequate state process. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). The "test for evaluating procedural due process claims" in the criminal law context is whether the State action

"offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Medina v. California*, 505 U.S. 437, 443 (1992) (citing *Patterson v. New York*, 432 U.S. 197, 201-02 (1977)); *Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 69 (2009) (applying *Medina* to adequacy of post-conviction procedures for DNA testing).

Mr. Speer demonstrates a strong likelihood of satisfying each step of the analysis.

A. **Texas Code of Criminal Procedure 43.24 Provides Mr. Speer a Liberty Interest Protected by the Due Process Clause of the Fourteenth Amendment.**

Mr. Speer has identified a cognizable liberty interest in Article 43.24 of the Texas Code of Criminal Procedure. State laws that "use explicitly mandatory language in connection with requiring specific substantive predicates" create a protected liberty interest. *Hewitt v. Helms*, 459 U.S. 460, 472 (1983). *See also Richardson v. Joslin*, 501 F.3d 415, 419 (5th Cir. 2007) ("[A] protected liberty interest exists only when a regulation uses 'mandatory language to place a substantive limit on official discretion."). Article 43.24 speaks in unmistakably mandatory terms: "No torture, or ill treatment, or unnecessary pain, shall be inflicted upon a prisoner to be executed under the sentence of the law." Tex. Code Crim. Proc. art. 43.24. And the provision is specifically designed to restrict the discretion of state officials in regard to their conduct toward death-sentenced prisoners. *See Helms*, 459 U.S. at 472. It therefore creates a protected liberty interest.[5]

Mr. Speer's claim fundamentally differs from *Sepulvado v. Jindal*, 729 F.3d 413 (5th Cir. 2013), and *Whitaker v. Collier*, 862 F.3d 490 (5th Cir. 2017), which Defendants will likely contend are controlling. In *Sepulvado*, the Fifth Circuit held that a condemned Louisiana prisoner lacked a

---

[5]Article 43.24 does not fall within the ambit of *Sandin v. Conner*'s analysis for identification of state-created liberty interests in prison regulations for management of conditions of confinement. 515 U.S. 472, 481 (1995). Even if it did, Article 43.24's language prohibiting infliction of "torture, [ ] ill treatment, [and] unnecessary pain" prevents "atypical" and "significant" harms that are not reducible to "the ordinary incidents of prison life." *Id.* at 484. *See Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (supermax conditions were atypical and significant "under any plausible baseline").

cognizable liberty interest under the *Eighth Amendment* that could be enforced under the Due Process Clause. 729 F.3d at 419-20. But Mr. Speer seeks minimally adequate procedures to enforce unique *Texas* law created to protect the "condemned." Similarly, in *Whitaker v. Collier*, the "core of [Plaintiffs'] suit [was] a challenge to the method of execution under the Eighth Amendment." 862 F.3d 490 at 497. Mr. Speer is not challenging the method of execution—lethal injection— selected by Texas; he is challenging his inability to discover or obtain process on the State's plan to carry out that method using an illegally obtained and long-expired drug that was recently subject to intense heat, smoke, and water which likely render the drug not fit for the purpose of a humane execution.

Mr. Speer's claim seeks protection of enforceable state-created liberty interests that provide greater protection than the Eighth Amendment. The plaintiffs in *Sepulvado* and *Whitaker*, on the other hand, premised their alleged due process violations on a violation of the Eighth Amendment—a much higher bar to meet than Texas Code of Criminal Procedure article 43.24, which provides protection against "ill treatment" and "unnecessary pain." *See Glossip v. Gross*, 576 U.S. 863, 877 (2015) ("In order to show that a method of execution is cruel and unusual under the Eighth Amendment, an applicant must show that it is 'sure or very likely to cause serious illness and needless suffering,' not just 'unnecessary pain'") (citations omitted). That was "fatal" to Whitaker's claim of a due process violation. *Whitaker*, 862 F.3d at 500. In *Ex parte Murphy*, the CCA recognized the gulf between these standards: "unnecessary pain" prohibited by Article 43.24 and *Glossip*'s higher standard to show a violation of the Eighth Amendment. But the CCA ruled solely based on the Eighth Amendment without mentioning Article 43.24, denying Murphy

any process for adjudicating such a right.[6] Similarly, Speer's convicting court relied on the same language in *Glossip* to deny Mr. Speer's 11.05 writ without addressing his claim under Article 43.24. Pl. Ex. 33.

**B.      Mr. Speer Has Been Denied Adequate Process to Challenge the Deprivation of His Liberty Interest to be Free from Torture, Ill Treatment, and Unnecessary Pain.**

The State's denial of procedures capable of allowing a condemned prisoner to know whether he will be subject to torture, ill treatment, or unnecessary pain offends fundamental principles of fairness rooted deeply in this nation's history. *Medina*, 505 U.S. at 446, 448.[7]

First, Mr. Speer has been denied fair notice of the manner and means by which he will be executed in the face of credible evidence that the drugs available to TDCJ to perform his execution are expired and fire-damaged. The State offers no justification for its failure to afford minimum procedures to allow Mr. Speer to protect his interests guaranteed under the Texas Code of Criminal Procedure, including its refusal to notify Mr. Speer of the provenance and condition of the drug it intends to use in his execution.

Specifically, despite Mr. Speer's numerous requests through administrative and court proceedings, Defendants refuse to disclose information necessary for assessing whether the drugs will cause unnecessary pain, torture, or ill treatment. Defendants either refuse to provide information already in their possession or else remain willfully ignorant of the information in reckless disregard for Mr. Speer's rights. For example, the State refuses to provide Mr. Speer basic information in its possession about the location of its drug supply at the time of the August 25 fire

---

[6] *Murphy*, 2023 WL 6586973, at *3 ("[U]nder *Glossip*, in order to show that a method of execution is cruel and unusual under the Eighth Amendment, an applicant must show that it is "sure or very likely to cause serious illness and needless suffering," not just "unnecessary pain.").

[7] As stated in his Complaint, Mr. Speer believes the framework of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), should apply to his claim. Compl. ¶ 100 & fn 100. Without conceding that, he nevertheless can meet the *Medina* standard, as explained below.

and its condition following the fire—information the State is required to disclose under the Public Information Act. Defendants also refuse to conduct necessary testing on the drugs to assess their pH levels, the presence of precipitants, and the presence of degradants. *See* Compl. ¶¶ 63-64. According to the State, Mr. Speer may not even be informed whether the drug the State plans to use is one in its current inventory. *See* Pl. Ex. 28.[8] This amounts to an unsettling game of Russian roulette, in which Mr. Speer will not know whether he will be injected with a safe and lethal dose of pentobarbital or something else entirely that will be exceptionally painful. The added psychological torture of not knowing also constitutes torture, ill treatment, and unnecessary pain under Article 43.24.

By sending requests for information to TDCJ, grieving his objection to the use of fire-damaged drugs, and filing an application for an original writ of habeas corpus in Texas state court, all to no avail, Mr. Speer has demonstrated the inadequacy of the state-law procedures available to him. *See Osborne*, 557 U.S. at 71 (explaining that it is "[Speer's] burden to demonstrate the inadequacy of the state-law procedures available to him in state postconviction relief.").

Second, Mr. Speer has been denied an opportunity to be heard for the likely denial of his right under Article 43.24. The courthouse doors have so far been shut to Mr. Speer. He cannot bring a civil suit because any temporary injunction will be instantly vacated. *See e.g.,* Pl. Ex. 22

---

[8] TDCJ has a history of lack of transparency in this regard, and has even misrepresented what drugs would be used in particular executions in prior legal proceedings. For example, after the execution of Robert Fratta, TDCJ disclosed for the first time that it received eight new doses of drugs for executions *five days* before Mr. Fratta's execution—one of which was used in Mr. Fratta's execution. *See* Pl. Ex. 17 at 5. TDCJ did not inform the court or the parties that they had just obtained new drugs that they planned to use on Mr. Fratta during the hearing, which addressed the nine vials that the petitioners believed represented all the drugs in TDCJ's possession. Jolie McCullough, *Texas executes Wesley Ruiz despite ongoing fight over state's use of old lethal injection drugs*, Tex. Trib. (Feb. 1, 2023) https://www.texastribune.org/2023/02/01/texas-execution-drugs-wesley-ruiz/.

(CCA ordering a civil district court "to refrain from issuing any order purporting to stay…executions"). He cannot secure a state court "extraordinary" writ of mandamus or prohibition because it is impossible to meet the standard for a clear entitlement to relief with an obviously disputed factual record in his underlying claim under Article 43.24. That amounts to a "door to a brick wall," as one CCA judge observed. *Ex parte Alba*, 256 S.W.3d 682, 701 (Tex. Crim. App. 2008) (Johnson, J., dissenting).

Mr. Speer arguably is without a remedy in any proceeding on an original writ of habeas corpus as well. At this time, Mr. Speer's convicting court has denied him access to a hearing, factual development procedures, or a remedy because his factual allegations, according to the court, rest on "speculation". Pl. Ex. 33, at 3 (ECP 1-34). However, in denying Mr. Speer any relief, the trial court applied only *Glossip* and ignored his Article 42.43 and due process claims. *Id*. Mr. Speer may appeal that ruling, but the Texas intermediate court of appeals to which Mr. Speer would have to appeal cannot provide a remedy either.[9] Mr. Speer has sought leave to file a second original application for writ of habeas corpus directly in the CCA, which might provide him an opportunity to be heard. *See* Mot. Leave to File Orig. Appl. Writ Habeas Corpus, *Ex parte Speer*, No. WR-59,101-05 (Tex. Crim. App.) (Prelim. Inj. Exhibit 6). That proceeding is still pending. Should the CCA deny leave to file that original habeas application or summarily deny the application without discovery or a hearing, then Mr. Speer will be deprived of any forum for enforcing his liberty interest in Article 43.24. Mr. Speer seeks relief in this Court while that litigation is still pending in the CCA because Mr. Speer cannot afford to wait until his current

[9] In its January 10, 2023 Order vacating the civil court's temporary injunction just hours before Mr. Fratta's execution, allowing the execution to go forward, the CCA suggested that any order from any court that "circumvented [the CCA's] mandates and orders of the inmate's convicting courts" would be vacated. Pl. Ex. 25, at 2.

requests to be heard are denied before raising his due process claim.

Third, there is already significant evidence suggesting the State has violated Mr. Speer's right to be free from ill treatment but Mr. Speer is unable to vindicate that right. After holding a three and a half hour evidentiary hearing, a Texas civil district court found that TDCJ procures, possesses, distributes, or uses the pentobarbital in its possession to carry out executions in violation of several state laws.[10] Pl. Ex. 23. Violating numerous state laws that were created to protect people to carry out executions constitutes ill treatment of the condemned under Article 43.24. The State cannot be allowed to arbitrarily decide which laws to ignore when conducting executions just because the people they are executing have been condemned to die.

The civil court also found "that continued use of the Pentobarbital in [TDCJ's] possession would further violate [TDCJ's] duty to comply with Art. 43.24." Specifically, the court found that the plaintiffs presented unrebutted evidence showing the following:

1. Expired drugs fall out of solution. That means they become grainy, not liquid. Those crystals, when injected into a vein, cause *burning pain* in and of themselves. In addition, they can cause blockages in the blood vessels and those blockages are *painful*.

2. Expired drugs contain degradants. Even if, as Defendants suggest but did not demonstrate with evidence, there remains potent pentobarbital in the vials, the remaining pentobarbital will not act like pentobarbital in the presence of the degradants.

3. Respondents have handled their pentobarbital with disregard for its purity, stability, and activity in the body in the presence of degradants and contaminants.

---

[10] *See* Pl. Ex. 23 at 4 ("Defendants have not shown, nor have they attempted to show, that they cannot comply with the Texas Code of Criminal Procedure without violating the Texas Pharmacy Act, the Texas Health and Safety Code, the Texas Controlled Substances Act, and other statutes"), *id.* at 5 ("Defendants did not offer any evidence or witnesses to dispute Plaintiffs' assertion that Defendants obtained Pentobarbital without a prescription.").

4. Degradants form with time, and Respondent does not test for them. Defendants have reintroduced tested vials into their stocks. Defendants have no way to know whether the testing process introduced organic or *unnecessary pain* and unpredictable activity in the body of condemned people.

Pl. Ex. 23 at 5-6 (emphasis added). The court found that TDCJ "failed to provide evidence or testimony to contradict Plaintiff's evidence that expired Pentobarbital will likely cause such torture, ill treatment, or unnecessary pain." Pl. Ex. 23 at 4.

TDCJ has not changed the way it stores and extends its BUDs since the civil court's findings in January 2023. As such, all the problems the court identified nearly months ago still apply to TDCJ's current batch of drugs. The only difference, however, is that the current supply of drugs—which TDCJ plans to use on Mr. Speer—is now 11 months older and has now been further degraded as a result of the August 25 fire. *See generally* Pl. Ex. 12. The evidentiary record supporting the fact that the drugs TDCJ uses in executions are likely to cause unnecessary plain, is therefore, stronger now than it was when the civil court entered a temporary injunction on less evidence earlier this year.

The prior litigation of similar issues in Jedidiah Murphy's case strengthens Mr. Speer's showing of inadequacy of the procedures available to vindicate his Article 43.24 right. On October 10, the State executed Mr. Murphy using the same batch of drugs it plans to use on Mr. Speer. Before his execution, Mr. Murphy filed state and federal actions arguing, in part, that the State's use of these drugs violated his Article 43.24 right, as well as his rights under the Texas Constitution and the Eighth Amendment. Order Mot. Stay Execution, ECF 9, *Murphy v. Lumpkin*, No. 1:23-cv-01199-RP-SH, at *5 (W.D. Tex. Oct. 6, 2023) (Prelim. Inj. Exhibit 7) (Murphy Order) (denying stay of execution; Murphy did not appeal the denial of his stay of execution); *Ex parte Murphy*,

No. AP-77,116, 2023 WL 6586973, at *2 (Tex. Crim. App. Oct. 9, 2023). As in Mr. Speer's case, the state trial court dismissed Mr. Murphy's lawsuit without a hearing on the basis that he had failed to demonstrate he met the "threshold for relief" as to all of his claims because he had not met the Eighth Amendment standard of *Glossip. See Murphy*, 2023 WL 6586973 at *1. That decision was affirmed in a non-precedential opinion by the CCA. *Id.*

The federal court denied his motion for a stay of execution on the ground that "Murphy's allegations that the Huntsville fire damaged TDCJ's pentobarbital supply is purely speculative" because Mr. Murphy "provide[d] no independent evidence showing that TDCJ stores its pentobarbital in the Huntsville Unit or that, even if stored there, the drug was impacted by the fire." Murphy Order at 5. Mr. Murphy had alleged a multifarious claim that the violation of several state laws amounted to a violation of the Eighth Amendment, due process, and the Equal Protection Clause. Though Mr. Murphy mentioned Article 43.24 in this omnibus claim, the district court did not address such a theory in denying Mr. Murphy a stay. *See id*. at 7-8. The district court therefore refused to consider the adequacy of due process afforded to Murphy in relation to his claims under Article 43.24. These proceedings show the bind condemned prisoners are placed in because TDCJ refuses to afford prisoners adequate process for claims brought under Article 43.24.

The State's failure to provide the minimal procedures that Mr. Speer seeks—notice and a fair hearing—offends fundamental and long-established guarantees of public oversight of executions. *See Osborne*, 557 U.S. at 62 (citing *Medina*, 505 U.S. at 446, 448). At the nation's founding, executions were public and, therefore, information about the means employed in executions was also public. "It was almost unthinkable to execute criminals anywhere but in the open, where everyone could watch and learn." Stuart Banner, *The Death Penalty: An American History* 147 (2002). Well into the twentieth century, Texas carried out executions by hanging, a

"public show carefully arranged beforehand" and attended by people of all class and rank. James W. Marquart et al., *The Rope, The Chair, and The Needle: Capital Punishment in Texas, 1923-1990* 12 (1994) (internal quotation marks and citation omitted).

When states moved executions out of the public realm and into prisons in the mid-1800s, they "implemented procedures that ensured executions would remain open to some public scrutiny." *Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 875 (9th Cir. 2002). For example, when a New York legislative committee debated whether to move executions into prisons, it noted that "if punishments were privately inflicted, it could not be known whether they were actually, and justly and properly, inflicted . . . or that persons had not become[] victims." Louis P. Masur, *Rites of Execution* 115 (1989) (quoting Document No. 79, in 2 Documents in the Senate of the State of New York, Fifty-Eighth Session, 1835, at 241, 244, 250 (1835)) (internal quotation marks omitted).[11] Originally enacted in 1856, Article 43.24's protection for the condemned arose against the backdrop of public executions. *See* 1856 Code Crim. Proc., 6th Leg., R.S., title VI, art. 713, 1856 Tex. Crim. Stat. at 136.

Furthermore, procedures for notice and a hearing are also essential features of fundamental fairness. *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 281 n.3 (1998) (plurality op.) ("This substantive constitutional prohibition [against cruel and unusual punishment] implicate[s] due process protections."). In *Ford v. Wainright*, 477 U.S. 399 (1986), the Court held that

---

[11] *See also* Kelly A. Mennemeier, *A Right to Know How You'll Die: A First Amendment Challenge to State Secrecy Statutes Regarding Lethal Injection Drugs*, 107 J. Crim. L. & Criminology 443, 473-76 (2017) (tracing a "tradition of access to information about executions").

Mr. Speer does not here challenge the State's laws governing the confidentiality of persons participating in the execution procedure or any person or entity that manufactures, transports, tests, procures, compounds, prescribes, dispenses, or provides a substance or supplies used in an execution. *See* Tex. Code Crim. Proc. art. 43.14(b). *Cf.* Mennemeier, *supra*, at 475 (acknowledging traditional protection for identity of executioners).

convicted inmates claiming that execution of the insane violates the Eighth Amendment are entitled to fundamental procedural protections under the Fourteenth Amendment. *Id.* at 413-14; *id.* at 424 (Powell, J., concurring in part and concurring in the judgment) ("It is clear that an insane defendant's Eighth Amendment interest in forestalling his execution unless or until he recovers his sanity cannot be deprived without a 'fair hearing.' Indeed, fundamental fairness is the hallmark of the procedural protections afforded by the Due Process Clause.").

For these reasons, the State's continual denials of Mr. Speer's requests for information or for a forum in which to conduct a factual inquiry into the integrity of the pentobarbital supply in the wake of the Huntsville fire violates the Fourteenth Amendment's guarantee of procedural due process. *See Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).

### C. The State's Likely Assertion of Procedural Obstacles Must Fail.

Mr. Speer also expects  Defendants to contend that his claim cannot prevail because (1) he cannot show exhaustion of administrative remedies under the PLRA, *see* 42 U.S.C. § 1997e(a); *Ramirez v. Collier*, 595 U.S. 411, 421-22 (2022) (describing Texas grievance procedures), and (2) because the statute of limitations to his § 1983 action has lapsed, *see Reed v. Goertz*, 598 U.S. 230, 235-36 (2023). These arguments would not detract from Speer's likelihood of prevailing.

As to limitations, Mr. Speer's due-process claim is only "complete" when "the State fails to provide due process." *Reed*, 598 U.S. at 236 (citation omitted). Mr. Speer's claim will be "complete" when the state litigation that could afford him discovery and a hearing has "ended." *Id.* Because Mr. Speer's state-court litigation seeking to enforce Article 43.24 is pending, his limitations period has not begun. *Id.* In any case, the gravamen of Speer's claim is the August 25 fire, which significantly altered the actual drugs in the State's possession and reset any accrual date for a statute of limitations. *Cf. Whitaker*, 862 F.3d at 495 (finding that "insignificant change[s]" did not alter accrual date to challenge Texas protocol). Mr. Speer also could not have

known the execution drugs the State planned to use were expired until an execution date was set and he knew the drugs in the State's possession were, in fact, expired.

Any exhaustion argument also must fail. TDCJ's grievance system is not "available" to grieve Speer's due process claim concerning lack of notice and a hearing in state courts to enforce Article 43.24. *See* TDCJ, Offender Orientation Handbook 74 (Feb. 2017), https://www.tdcj.texas.gov/documents/Offender_Orientation_Handbook_English.pdf ("You may not grieve [ ] State or federal . . . laws" or "any matter beyond the control of the agency to correct"); *Ross v. Blake*, 578 U.S. 632, 643-44 (2016) (grievance procedure must be "capable of use" to obtain relief).[12]

## II. Mr. Speer Will Suffer Irreparable Harm Absent Injunctive Relief.

Mr. Speer will suffer irreparable harm if this Court does not enter a preliminary injunction before he can fully litigate his claim. Irreparable harm is "necessarily present in capital cases." *Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (Powell, J., concurring); *Evans v. Bennett*, 440 U.S. 1301, 1306 (1979) (granting stay of execution in light of the "obviously irreversible nature of the death penalty"). *See also O'Bryan v. Estelle*, 691 F.2d 706, 708 (5th Cir. 1982) (per curiam). The threatened harm is "beyond remediation" because no "adequate compensatory or other corrective relief will be available at a later date," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (5th Cir. 2006) (citations omitted). Mr. Speer's claim is therefore "categorically irreparable." *Nken*, 556 U.S. at 435.

## III. The Balance of Equities Favor a Preliminary Injunction.

Mr. Speer recognizes the State has an interest in enforcing valid criminal judgments.

---

[12] Speer has pursued his administrative remedies complaining of the use of fire-damaged drugs as far as they will go. *See* Compl. ¶¶ 86-89 (awaiting pending on Oct. 6 Step 2 grievance).

However, the relief Mr. Speer seeks would not frustrate that interest. The public and Mr. Speer's interests far outweigh the State's interest in withholding information about its executions.

Defendants know but will not tell Mr. Speer which drugs TDCJ will use, where the drugs were located during the August 25 fire, or the condition of the drugs. TDCJ has previously provided other condemned men some of the information Speer needs, including about the specific drug to be used. *TDCJ v. Levin*, 572 S.W.3d 671, 673 (Tex. 2019) (noting TDCJ released information on "the drug or drugs, including back-up, [Texas] intend[s] to use"). Defendants also cannot assert protection of state interests when the Texas Legislature has decided the information should be public, while maintaining confidentiality over other execution-related subjects. *See id.* at 679 (discussing Legislature's "policy decision" to protect "highly important interests" regarding execution procedure); Tex. Code Crim. Proc. art. 43.14(b); Tex. Gov't Code § 551.1081.

The State ordinarily represents the interests of the victims in the timely enforcement of the death sentence. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019). Not so here. Sammie Gail Martin, the sole surviving family member of victim Gary Dickerson, has asked the Governor and Texas Board of Pardons and Paroles to grant clemency for Mr. Speer and firmly opposes his execution. Decl. Sammie Gail Martin at 1 (Prelim. Inj. Exhibit 8). Ms. Martin was not informed of the execution date until she was contacted by Mr. Speer's team in September. *Id*. Ms. Martin "spent much time reflecting on what justice my brother and my family deserve." *Id*. "[I]n my heart, I feel that [Mr. Speer] is not only remorseful for his actions but has been doing good works for others and has something left to offer the world." *Id*.

Moreover, Mr. Speer is not attempting to prevent his execution altogether, only to prevent the State from carrying out his execution in an unlawful manner that would cause him unnecessary pain without first providing him adequate process. If the State plans to use non-expired drugs that

were unaffected by the August 25, 2023 fire—as it claims it will—then it will be no burden on the State to produce documentation to Mr. Speer confirming that information. Instead, Defendants have stonewalled Mr. Speer and ignored the public interest in transparent government. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980) (plurality opinion) ("Without publicity, all other checks [on government] are insufficient . . . ." (quoting 1 Jeremy Bentham, *Rationale of Judicial Evidence* 524 (1827)).

The public interest is not served by public ignorance about whether a torturous or unnecessarily painful execution will be carried out without any transparency or oversight, using a substance clearly damaged by a recent catastrophic building fire. The public interest would be served by allowing discovery to proceed to determine the condition of the expired and fire-damaged pentobarbital.

## CONCLUSION AND PRAYER FOR RELIEF

In reliance on the above authorities and arguments, Mr. Speer respectfully requests a preliminary injunction as set forth in the attached proposed order to preserve the status quo until this Court resolves this above-captioned action.

Respectfully submitted,

Marie Hanewinckel (*pro hac vice*)
Taryn Winston (*pro hac vice*)
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Email: mhanewinckel@cov.com
Email: twinston@cov.com

/s/ Joshua Freiman
Joshua Freiman
Fed Bar No. 3342395
NY Bar No. 5353545
Donna Coltharp
Assistant Federal Public Defenders
919 Congress Ave., Ste. 950
Austin, Texas 78701

*Counsel for William Keith Speer*

## CERTIFICATE OF CONFERENCE

On the 18th day of October, 2023, Mr. Speer's counsel conferred with opposing counsel concerning the relief sought in this Motion, and was advised that opposing counsel opposed this Motion.

/s/ Joshua Freiman
Joshua Freiman

## CERTIFICATE OF SERVICE

I certify that on October 23, 2023, a true and correct copy of the foregoing pleading will be served on counsel for all Defendants by email (and/or the Court's electronic filing system) to:

STEPHEN M. HOFFMAN
Assistant Attorney General
Texas Bar No. 24048978
Southern District Bar No. 602073
P. O. Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936-1400
Fax: (512) 320-8132
Email: Stephen.Hoffman@oag.texas.gov

/s/ Joshua Freiman
Joshua Freiman